United States District Court
for the
Southern District of Florida

| | |
|---|---|
| City of Miami, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-22636-Civ-Scola |
| | ) |
| Eli Lilly and Co. and others, | ) |
| Defendants. | ) |

## Order

This matter is before the Court on the Defendants' motion to dismiss. (ECF No. 60.) The Plaintiff (the "City") filed an opposition (ECF No. 70), and the Defendants filed a reply in support of their motion (ECF No. 79). After careful consideration of the briefs and the relevant legal authorities, the Court **grants in part and denies in part** the Defendants' motion. (**ECF No. 60**.)

### 1. Background

Over the past few decades, the price of a life-saving drug has risen from approximately $20 to as much as $700. (ECF No. 44 at ¶ 5.) Tracing this astronomical rise in price, the City's amended complaint alleges a price-fixing conspiracy involving fifteen entities that either manufacture insulin and other diabetes medications[1] or manage and negotiate certain pharmacy benefits. (ECF No. 44.) In particular, the City sues Defendants Eli Lilly, Novo Nordisk, and Sanofi (the "Manufacturer Defendants") and CVS Caremark, Express Scripts, OptumRx, and Aetna Rx (the "PBM Defendants").[2]

The Court will start with a brief summary of the general distribution chain. Manufacturers create insulin and other medications, which are then sold to wholesalers. (*Id.* at ¶ 189.) Wholesalers sell to pharmacies and other retail businesses, who then sell to consumers, many of whom have a health plan. (*Id.*) The price paid at each stop on the distribution chain varies, in part because of entities called pharmacy benefit managers ("PBMs"), like CVS Caremark, Express Scripts, OptumRx, and Aetna Rx. (*Id.* at ¶¶ 190, 193.) These entities, a somewhat recent phenomena, state that they manage drug benefits for health plans—such as the City's—and work to lower the price of drugs for those health plans. (*Id.* at ¶¶ 14, 69, 89, 108, 122, 166, 204.) These entities negotiate the "formulary placement" for each drug—in essence, they negotiate what

---

[1] The medications at issue include Humulin N, Humilin R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Soliqua, Apidra, Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic. (ECF No. 44 at 5 n.9.)

[2] Undefined terms shall have the meaning set out in the Amended Complaint. (ECF No. 44.)

medications will be offered by their health plan clients and covered by insurance. (*Id.* at ¶¶ 3, 14, 224.) These negotiations go in many directions—PBMs negotiate with manufacturers regarding the formulary placement for each manufacturer's medications, they negotiate what health plans will pay for each medication, and they negotiate the price that each pharmacy will receive for this medication. (*Id.* at ¶¶ 194, 199, 201.)

This lawsuit, in large part, focuses on one aspect of these negotiations— rebates paid from the Manufacturer Defendants to the PBM Defendants. In general, medications that are covered by insurance will be utilized at higher rates, putting the PBM Defendants in a powerful negotiating position as a gatekeeper between manufacturers and consumers. (*Id.* at ¶¶ 13, 215, 225.) The PBM Defendants represent that they negotiate lower drug prices for their clients, but insulin prices have not decreased while rebate payments to the PBM Defendants have increased. (*See id.* at ¶¶ 248, 279–287.) Indeed, the Manufacturer Defendants have begun offering increasingly larger rebates (or as the City refers to these payments—kickbacks) to the PBM Defendants in an effort to receive better formulary placements for their diabetes medications. (*Id.* at ¶¶ 16, 199); (ECF No. 70 at 25.) And to negotiate higher rebates, the Manufacturer Defendants raised the prices of their medications. (*Id.* at ¶ 229.) Health plans end up paying a price that is the "reported price," or "Average Wholesale Price," less a discount negotiated by the PBM Defendants—the discount is less than the rebate received by the PBMs. (*Id.* at ¶¶ 195, 261.) The PBM Defendants then reimburse pharmacies a lower price for the medication. (*Id.* at ¶ 256.)

The City alleges a vast conspiracy among and between the Manufacturer Defendants and the PBM Defendants to raise the price of diabetes medications. As evidence of this conspiracy, the City alleges that the medications at issue have not meaningfully changed in the last decade, if not the last 100 years.[3] (*Id.* at ¶¶ 8, 159.) Notwithstanding the lack of advancement, the price of each has increased in a substantially uniform manner. (*Id.* at ¶¶ 177–82.) These price increases occurred despite opacity in the pricing system, in which the rebates, fees, and other payments between the Manufacturer Defendants and the PBM Defendants are not disclosed. (*Id.* at ¶¶ 191, 231.)

Moreover, the City points to price data as evidence of increasing rebate payments to the PBM Defendants. While payments to the PBM Defendants are

---

[3] The City alleges that while the medications at issue have gone largely unchanged, the Manufacturer Defendants engage in "evergreening" their patents—i.e., filing new patent applications for minor changes—and thereby preserve patent protections and minimize new competition. (ECF No. 44 at ¶¶ 310–11.)

not disclosed, there is an increasing discrepancy between the Manufacturer Defendants' reported prices (which include rebates and have dramatically increased) and their "net prices" (which are post rebate and have largely been steady). (*Id.* at ¶¶ 248–52.)

As a result of this conspiracy, the City alleges that it pays more in health care costs related to diabetes care. The City provides health benefits to certain individuals as a self-funded health plan. (*Id.* at ¶¶ 272–74.) The City has received services from "one or more" PBM Defendants, yet the City's healthcare costs have risen, despite representations that the PBM Defendants were working to reduce costs. (*Id.* at ¶¶ 277–80, 302, 304, 357.)

### 2. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Under Federal Rule of Civil Procedure 8, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *See id.*

In applying the Supreme Court's directives in *Twombly* and *Iqbal*, the Eleventh Circuit has provided the following guidance to the district courts:

> In considering a motion to dismiss, a court should 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Further, courts may infer from the factual allegations in the complaint obvious alternative explanation[s], which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (citations omitted). These precepts apply to all civil actions, regardless of the cause of action alleged. *See id.*

Where a cause of action sounds in fraud, however, Federal Rule of Civil Procedure 9(b) must be satisfied in addition to the more relaxed standard of Rule 8. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," although "conditions of a person's mind," such as malice, intent, and knowledge, may be alleged generally. Fed. R. Civ. P. 9(b). "The 'particularity' requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citations omitted). "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, [grounded on] baseless allegations used to extract settlements." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002). Thus, the Rule's "particularity" requirement is not satisfied by "conclusory allegations that certain statements were fraudulent; it requires that a complaint plead facts giving rise to an inference of fraud." *W. Coast Roofing & Waterproofing*, 287 F. App'x at 86. To meet this standard, the complaint needs to identify the precise statements, documents, or misrepresentations made; the time and place of, and the persons responsible for, the alleged statements; the content and manner in which the statements misled the plaintiff; and what the defendant gained through the alleged fraud. *See id.*

With these standards in mind, the Court turns to the City's amended complaint to see whether its claims are sufficiently alleged to withstand dismissal.

### 3. Analysis

The City brings five claims against all Defendants, alleging causes of action under (1) the Florida Antitrust Act, (2) common law fraud, (3) money had and received, (4) unjust enrichment, and (5) civil conspiracy. The Defendants seek to dismiss all claims. The Court holds that the City has met its pleading burden as to the PBM Defendants for all counts except common law fraud. The Court finds that the City only met its pleading burden as to the Manufacturer Defendants for its claims under the Florida Antitrust Act and Civil Conspiracy. The Court will address the parties' argument for each claim.

### A. Florida Antitrust Act

At its root, the City alleges a price-fixing conspiracy between and among the Manufacturer Defendants and the PBM Defendants to artificially raise prices of insulin and other diabetes medications in order to facilitate the negotiation of large rebates in exchange for preferential formulary placement. (ECF No. 44 at ¶ 330.) The Defendants argue that this claim must be dismissed, as the City is an indirect purchaser of insulin, the City failed to state a claim, and the City failed to allege a hub-and-spoke conspiracy. (ECF No. 60 at 12–22.) The Court will address these arguments in turn.

### *1. Indirect Purchaser*

Before reaching the legal sufficiency of the City's price-fixing claim, the Defendants argue that the City has no standing to bring such a claim as the City does not purchase insulin from the Manufacturer Defendants. The indirect purchaser rule provides that "purchasers who are two or more steps removed from the [antitrust] violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, 139 S.Ct. 1514, 1520 (2019) (discussing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)).[4] The Supreme Court has identified multiple rationales for this rule, namely: "(1) facilitating more effective enforcement of antitrust laws; (2) avoiding complicated damages calculations; and (3) eliminating duplicative damages against antitrust defendants." *Apple*, 139 S.Ct. at 1524.

The Defendants argue that the City is an indirect purchaser of insulin. Tracing the distribution chain laid out above, the Defendants contend that the City is not a wholesaler or pharmacy, or even a consumer, that purchases insulin at its inflated price; rather, the City, in its capacity as a self-funded health plan, reimburses others for the medications at a rate that is potentially passed through multiple non-defendant intermediaries. (ECF No. 60 at 12–14); (*see* ECF No. 44 at ¶ 194.) However, the City argues that it is a direct purchaser, as it paid an unnamed PBM Defendant and received services from "one or more" PBM Defendants. (*Id.* at ¶¶ 277, 357.) The City contends that it is of no moment that it does not purchase medication from the Manufacturer Defendants, as it made purchases from at least one of the PBM Defendants, who are within the alleged price-fixing conspiracy.

The indirect purchaser doctrine is a judicial rule of statutory standing, meant to determine whether the plaintiff has adequately alleged an antitrust

---

[4] Florida courts have held that the indirect purchaser rule applies to the Florida Antitrust Act. *See Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 103 (Fla. Dist. Ct. App. 1996); *cf.* Fla. Stat. § 542.32. The City does not contend otherwise, and therefore the Court will apply the indirect purchaser rule to the Florida Antitrust Act.

injury. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL No. 2924, 2021 WL 2685640, at *4 (S.D. Fla. June 30, 2021) (Rosenberg, J.); *see also Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1448 (11th Cir. 1991) ("Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws[.]"). While it is a "bright-line rule," applying the rule is not as simple as merely following the flow of money in a distribution chain. *See Apple Inc.*, 139 S.Ct. at 1523–24. Rather, courts look to the alleged antitrust conduct and whether the plaintiff alleged an injury resulting from that conduct. *See id.* ("If the [antitrust defendant's] unlawful monopolistic conduct caused a consumer to pay [the defendant] a higher-than-competitive price, the consumer is entitled to sue[.]"). Therefore, the Court must determine whether the City sufficiently alleged that it was an "[1] immediate buyer [2] from [an] alleged antitrust violator[]." *See id.* at 1521.

The Court holds that the City met its pleading burden. Here, the City alleges that it paid a PBM Defendant for insulin (ECF No. 44 at ¶ 357), which is sufficient at this stage. Contrary to the Defendants' arguments, this allegation is not necessarily inconsistent with the City's allegation that it also contracts with insurance companies which then contract with PBMs. (*Id.* at ¶ 276.) The exact nature of the City's relationship to the PBM Defendants is largely a factual question that cannot be resolved on a motion to dismiss.

Moreover, the Defendants' argument that the City is an indirect purchaser as it did not pay the inflated reported price—which is allegedly paid by wholesalers—is unavailing. The Defendants point to *MSP Recovery*, which dismissed similar claims brought against the Manufacturer Defendants and which held that "the chain of distribution alleged in this matter is fatal" as the plaintiff there did not pay the inflated price directly. (ECF No. 60 at 14 (discussing *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-cv-2211, 2019 WL 1418129, at *16 (D.N.J. Mar. 29, 2019)).) However, here, unlike in *MSP Recovery*, the City also sued the PBM Defendants, to which the City made payments. (*See* ECF No. 44 at ¶ 357); *see MSP Recovery*, 2019 WL 1418129, at *3. Moreover, the court in *MSP Recovery* did not have the benefit of the Supreme Court's decision in *Apple Inc.*, which, as discussed above, focused on the alleged antitrust conduct rather than the chain of distribution. *See Apple Inc.*, 139 S.Ct. at 1523–24. Here, the City alleges that the Defendants agreed to large rebates, increased the reported price of insulin, and then overcharged health plans based on the inflated reported price. (*See* ECF No. 44 at ¶ 256.) At this stage, that is sufficient.

Last, the Defendants complain that the City did not identify the exact PBM Defendant to which it made payments. (ECF No. 60 at 13 n.5.) The City's failure to do so is not fatal. Courts will disregard generalized allegations where they fail

to give notice to the defendants of the claims against them. *See Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1274 (M.D. Fla. 2009). But allegations concerning statutory standing are different—such allegations are not primarily intended to apprise defendants of the claims against them, but rather to assure courts that jurisdiction exists. *Cf. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) (noting that jurisdiction involves the courts' "statutory or constitutional power to adjudicate the case") (emphasis omitted). Therefore, "'at the pleading stage, general factual allegations . . . may suffice'" to establish statutory standing. *Cf. DiMaio*, 520 F.3d at 1301 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). For this reason, the City's general allegation that it purchased insulin from a PBM Defendant suffices, and the City alleged that it was an "immediate buyer from [an] alleged antitrust violator[]." *See Apple Inc.*, 139 S.Ct. at 1521.

### 2. Failure to State a Claim

Next, the Defendants argue that the City has failed to state a claim for violation of the Florida Antitrust Act. To state a claim for price fixing, a plaintiff must allege facts that "suggest 'an agreement or conspiracy[.]'"[5] *See Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (quoting *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1262 (11th Cir. 2019)). The agreement may be "tacit or express," but the "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement[.]" *See Auto. Alignment*, 953 F.3d at 726 (quoting *Twombly*, 550 U.S. at 553). To plead such an agreement, a plaintiff may allege either (1) "[d]irect evidence" of such an agreement or (2) "circumstantial evidence" of a conspiracy. *See United Am. Corp. v. Bitmain Inc.*, 530 F. Supp. 3d 1241, 1258 (S.D. Fla. 2021) (McAliley, Mag. J.). When alleging circumstantial evidence of an agreement, tacit or express, a plaintiff must do more than merely plead "parallel conduct" among the alleged conspiracy members. *See Auto. Alignment*, 953 F.3d at 726. Rather, a plaintiff must allege additional "plus factors" that make "parallel conduct 'more probative of conspiracy than of conscious parallelism.'" *See id.* (quoting *Quality Auto*, 917 F.3d at 1262). Plus factors can include: (1) price uniformity where market conditions would otherwise "ordinarily result in divergent pricing"; (2) actions contrary to economic self-interest; and (3) an opportunity to exchange

---

[5] Courts look to the federal antitrust laws when evaluating claims brought under the Florida Antitrust Act. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.").

information that would otherwise be undisclosed. *See Quality Auto*, 917 F.3d at 1263–70; *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003). These plus factors need not prove a conspiracy but need only "tend to exclude the possibility of independent action." *Williamson Oil*, 346 F.3d at 1301 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 571 n.35 (11th Cir. 1998)).

Here, the City does not allege direct evidence of a conspiracy but relies on circumstantial evidence. Primarily, the City points to price increases that occurred in tandem and argues that there was no economic justification or self-interested rationale for such increases. (ECF No. 70 at 27–28.) The Defendants argue that this circumstantial evidence does not suffice, as the Manufacturer and PBM Defendants engage in individual rebate negotiations and as parallel price increases alone cannot state a claim for a price-fixing conspiracy. (ECF No. 60 at 16–19.) The Court will discuss the City's allegations concerning rebate negotiations and additional plus factors, although first the Court will briefly discuss the relevant market.

### a. *Relevant Market*

Before looking to the City's alleged circumstantial evidence, the Court will conduct a brief inquiry into the nature of the relevant market, as alleged. Some knowledge of the market is important because courts must review the alleged antitrust behavior against "rational and competitive business strategy" driven by the relevant market. *See Quality Auto*, 917 F.3d at 1266–67 (quoting *Twombly*, 550 U.S. at 554). The demand for insulin and related medications is "highly inelastic," meaning that changes in price largely do not affect consumer demand. (ECF No. 44 at ¶ 354.) Moreover, the market is an oligopoly, in which 99% of insulin is manufactured by the Manufacturer Defendants. (*Id.*) And, as alleged, there is little-to-no difference between the vast majority of insulin products. (*See id.* at ¶ 157.) A market run by oligopolists and distinguished by inelastic demand for undifferentiated products is likely highly unresponsive to consumer preference. The City also alleges that demand for each of the Manufacturer Defendants' medications is driven by the PBM Defendants, who act as gatekeepers between the manufacturers, insurance and health plans, and consumers. (*Id.* at ¶¶ 13, 224, 317, 349.) The PBM Defendants, who account for approximately 75% of the PBM industry, negotiate with the Manufacturer Defendants and represent that they negotiate to bring costs down for their clients. (*Id.* at ¶¶ 211, 280, 283, 301.) In a competitive market, the PBM Defendants would compete with each other for both clients and cheaper medications. (*Id.* at ¶¶ 211, 227, 369, 371.)

### b. *Rebate Negotiations*

Turning to the City's allegations concerning the Defendants' rebate negotiations, the Court holds that these allegations do not render the City's price-fixing conspiracy claim less suggestive. The Defendants argue the alleged fact that the Defendants engage in individual negotiations for ever-larger rebates demonstrates the lack of parallel, anticompetitive conduct. (ECF No. 60 at 16–17.) However, price-fixing agreements can take many forms—the general unifying principle is only that the agreement "directly affects price[.]" *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1569 (11th Cir. 1991); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (holding that a price fixing agreement is one with "the purpose and . . . the effect of raising, depressing, fixing, pegging, or stabilizing the price" of a good or service). The fact that the Defendants allegedly engage in individual rebate negotiations alone does not make the alleged conspiracy to fix the reported price of insulin less suggestive.[6] Therefore, the Court denies this basis to dismiss the City's price-fixing claim.

### c. *Plus Factors*

Next, the Court holds that the City has done more than allege mere parallel price increases. As discussed above, a plaintiff must allege "plus factors" in support of a price-fixing conspiracy; a plaintiff may not rely solely on allegations of parallel conduct or conscious parallelism in prices. *See Auto. Alignment*, 953 F.3d at 726; *Quality Auto*, 917 F.3d at 1264. Of course, the City need not establish the *existence* of an agreement at this stage, but it must only plead allegations that support an inference of an agreement. *See Twombly*, 550 U.S. at 556 (requiring "plausible grounds to infer an agreement" at the motion-to-dismiss stage). The City sufficiently alleges plus factors with its allegations of parallel price increases to nudge its claim to plausibility.

The City alleges that the parallel price increases are contrary to the Defendants' self-interest and that the market would expect to see insulin prices diverge. (ECF No. 44 at ¶¶ 227, 344.) According to the City, as insulin is a largely undifferentiated product, manufacturers in a competitive market would have to compete on price. (*See* ECF No. 44 at ¶ 333); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 658 (7th Cir. 2002) (Posner, J.) (noting that

---

[6] Moreover, these rebate negotiations are a core component of the City's alleged conspiracy. The City argues that these rebates are kickbacks in exchange for preferential formulary placement. (ECF No. 70 at 25); *cf. Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1111 (11th Cir. 2014) ("The defining characteristic of a kickback is divided loyalties.") (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013)). A kickback is still illegal even if firms agree to individually bid for it.

where "the product is uniform . . . competition would be expected"). And where costs fall, which the City alleges here, one would expect prices to fall as well. (ECF No. 44 at ¶ 33.) And where manufacturers compete on price, one would expect to see prices diverge, not converge. (*See id.* at ¶ 300.) Last, the City alleges that in a competitive market, lower insulin prices would follow negotiations by competitive PBMs. (*See id.* at ¶ 369.) The opposite has happened here.

    The Defendants argue that this is merely an example of oligopolistic price leadership, which was explained in *Quality Auto. See Quality Auto*, 917 F.3d at 1264–65. Courts have largely found price leadership within concentrated industries to be rational—absent an anticompetitive agreement—when such behavior on price results in increased profit and maintenance of market share. *See id.* (explaining that oligopolists are not likely to reduce price and may instead follow price increases, as doing so will maximize industry profits while maintaining market share); *Williamson Oil*, 346 F.3d at 1299 ("[C]onscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.") (quoting *City of Tuscaloosa*, 158 F.3d at 570). In essence, commentators generally find that rational oligopolists follow price increases as it can be profit-maximizing, whereas anticompetitive oligopolists abide by an anticompetitive agreement, which "typically requires firms to do things that are not independently profit-maximizing but that maximize profits only if other participants adhere to the agreement." *See* Areeda and Hovenkamp, Antitrust Law ¶ 1432(b) n.20 (2017).

    Here, the City has plausibly alleged that the Defendants have engaged in practices contrary to rational, competitive self-interest and that price uniformity has converged rather than diverged. First, the City alleges that the oligopolistic Manufacturer Defendants have raised prices without a corresponding increase in the net price (reported price minus rebates and other fees paid to the PBM Defendants). (ECF No. 44 at ¶¶ 186, 228, 249–52.) This suggests that the majority of the price increases have gone into rebates and other payments to the PBM Defendants while net prices remain stable. (*See id.*) Moreover, this suggests that the Manufacturer Defendants have only seen a modest rise in profit following the price increase, a rise that could be threatened by losing market share in rebate negotiations. (*See id.* at ¶¶ 224–25, 227–28.) Following a price increase when there is a concomitant risk of losing market share in subsequent negotiations is plausibly against the Manufacturer Defendants' self-interest, unless the risk of loss of market share is tempered by an anticompetitive agreement. *See* Areeda and Hovenkamp, Antitrust Law ¶ 1432(b) n.20; *see*

*Quality Auto*, 917 F.3d at 1264–65 (explaining that a rational oligopolist follows a price increase if the price increase would maximize industry profits and maintain some promise of stable market shares for each). Therefore, the City has plausibly alleged that the Manufacturer Defendants did not act self-interested in pursuit of profit-maximization, but rather that they agreed to raise prices and maintain market share.

Second, the City has alleged that the PBM Defendants have reaped the benefits of the price increases without negotiating insulin prices down or competing for clients. (*See* ECF No. 44 at ¶¶ 227, 348.) Therefore, despite the PBM Defendants' purported competitive interest in negotiating a reduction in prices, prices have risen. (*See id.* at ¶¶ 227, 371); *see also City of Tuscaloosa*, 158 F.3d at 572–73 (holding that competitive oligopolists would likely compete for clients while costs were stable and prices rose).

In total, the City alleges a market where the Manufacturer Defendants do not compete for consumers on price, as one could expect in a market of undifferentiated products. And the City has plausibly alleged that the Manufacturer Defendants do not independently follow price leadership to maximize profits and maintain market share, as one could expect in an oligopoly. Moreover, the City alleges that the PBM Defendants do not compete for clients and for lower prices, as one would expect from oligopolist gatekeepers. Rather, the City alleges that the Manufacturer Defendants compete for formulary placement by increasing prices and bidding up rebates and that the PBM Defendants sell formulary placements in exchange for higher rebates rather than lower prices. (*See* ECF No. 44 at ¶ 330.) Therefore, the City has sufficiently alleged that parallel price increases may not have been enacted in response to legitimate, rational oligopolistic price leadership.[7]

### 3. *Hub-and-Spoke Conspiracy*

Last, the Defendants argue that the City's price-fixing claim fails as the City does not allege a separate agreement among the PBM Defendants to fix prices. The Defendants characterize the City's alleged conspiracy as a hub-and-spoke conspiracy, in which the hub—the Manufacturer Defendants—conspired with themselves and the various spokes—the PBM Defendants—to illegally raise

---

[7] In a bullet-point list in its response, the City identifies several additional plus factors. (ECF No. 70 at 27–29.) As the City does not tie these plus factors to allegations in the amended complaint, it is unclear whether the City is contending that each of these factors apply in this case. This ambiguity is heightened as several of these plus factors are merely generalized statements of legal principles, not all of which are applicable at this stage. Nonetheless, the Court holds that the plus factors identified above are sufficient to suggest a plausible agreement at the motion-to-dismiss stage.

the price of insulin. (ECF No. 60 at 21.) The Defendants argue that a hub-and-spoke conspiracy requires an agreement among the spokes. (*Id.* (citing *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016).)

However, as the Defendants point out, all that is required is that the spokes must be "aware of each other and of their common aim." *See nFinanSe, Inc. v. Interactive Commc'ns Int'l*, No. 1:11-cv-3728-AT, 2012 WL 13009231, at *8 (N.D. Ga. July 24, 2012) (quoting *United States v. Seher*, 562 F.3d 1344, 1367 (11th Cir. 2009)). While, as the Defendants argue, the spokes create their own formularies and conduct their own rebate negotiations, the City has alleged that the PBM Defendants, which account for approximately 75% of the relevant PBM market, are aware of each other and have an alleged common aim to maximize profits and increase prices through formulary placement negotiations. (*See generally* ECF No. 44 at ¶¶ 13–15, 211, 215, 307, 338, 342.)

For the reasons set out above, the Court **denies** the Defendants' motion to dismiss the City's price-fixing conspiracy claim.

### B. Common Law Fraud

The Defendants also seek to dismiss the City's common-law fraud claim, in which the City alleges that the Defendants misrepresented or concealed the cost and related rebates of the medications at issue. (*See* ECF No. 44 at ¶ 368.) To state a claim for fraud, a party must allege "an intentional material misrepresentation upon which the other party relies to his [or her] detriment." *See Sun Life Assur. Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1222 (11th Cir. 2018) (quoting *Lance v. Wade*, 457 So.2d 1008, 1011 (1984)). Moreover, a claim for fraud must be stated with particularity under Rule 9(b); therefore, a plaintiff must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place and person responsible for the statement; (3) the content and manner in which these statements misled [it]; and (4) what the defendants gained by the alleged fraud." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019).

Turning first to the Manufacturer Defendants, the Defendants primarily argue that the City has not alleged any misrepresentations by the Manufacturer Defendants on which it relied. (ECF No. 60 at 22–23.) Courts have held that the publishing of artificially inflated prices constitutes a fraudulent statement. *See Harris Cnty., Tex. v. Eli Lilly and Co.*, No. H-19-4994, 2020 WL 5803483, at *16 (S.D. Tex. Sept. 29, 2020); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-cv-2211, 2019 WL 1418129, at *19 (D.N.J. Mar. 29, 2019). As the City alleges that the Manufacturer Defendants published such artificially

inflated prices,[8] (*see* ECF No. 44 at ¶¶ 287, 374), the City has adequately alleged that the Manufacturer Defendants made a material misrepresentation.

Next, the City also compiled a number of representations in which the PBM Defendants state that they worked for the benefit of health plans to lower the cost of insulin. (*See* ECF No. 44 at ¶¶ 279–287.) The Defendants argue that these statements amount to no more than puffery. (ECF No. 60 at 24.) Puffery refers to those statements that are "just too boosterish to justify reasonable reliance" and are usually composed of "exaggerated opinion," as opposed to factual misrepresentation. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318–19 (11th Cir. 2019). The PBM Defendants do not explain in what ways the statements that the City identified are puffery; rather, the alleged misrepresentations state that the PBM Defendants use the formularies to obtain the cheapest price for their clients. (*See* ECF No. 44 at ¶¶ 283, 285–87.) Such statements do not amount to mere opinion or nonquantifiable and vague claims. Therefore, such claims are not puffery and are actionable alleged misrepresentations.

However, the City has not adequately pled reliance. While the City alleged a number of misrepresentations, the City has not pointed, with the required particularity, to how the City relied on each. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (holding that a plaintiff must plead "the who, what, when, where, and how" under Rule 9(b)). The misrepresentations at issue largely concern statements made by various Defendants related to efforts to realize cost savings and health and safety outcomes for the PBM Defendants' clients. (*See* ECF No. 70 at 32.) As discussed above, the City's relationship to the Defendants is unclear. The City does not identify the Defendants with which it contracts, but the City could not detrimentally rely on a Defendant's representations concerning cost-savings or work performed for clients if the City was not a client of that Defendant. *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (holding that Rule 9(b) requires "specific allegations with respect to each defendant"); *GEICO Gen. Ins. Co. v. Hoy*, 136 So.3d 647, 651 (Fla. Dist. Ct. App. 2013) (holding that detrimental reliance is where one "has been placed in a worse position that he or she would have been absent the fraud").

---

[8] The Defendants argue that federal law prohibits including rebates in a list price for pharmaceutical products. (ECF No. 60 at 23 (discussing 42 U.S.C. § 1395w-3a(c)(6)(B) (in relevant part, defining "wholesale acquisition cost" of a pharmaceutical product as "not including prompt pay or other discounts, rebates or reductions in price")).) However, the City's claim is that the Manufacturer Defendants inflated the price of insulin and other medications through the use of fraudulent rebates that served as kickbacks to the PBM Defendants. The Manufacturer Defendants cannot use Section 1395w-3a(c)(6)(B) to avoid the City's allegations of wrongdoing.

Absent more particularized allegations concerning in what ways the City detrimentally relied on misrepresentations by each Defendant, the Court finds that the City has not adequately alleged fraud. Therefore, the Court **grants** the Defendants' motion to dismiss the City's claim for common law fraud.

### C. Unjust Enrichment and Money Had and Received

In Counts Three and Four, the City pleads claims for unjust enrichment and money had and received. Under Florida law, these claims have the same elements; a plaintiff must allege that "(1) [they] conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendant[] to retain it without paying the value thereof." *See Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012); *see also Hakim-Daccach v. Knauf Int'l GmbH*, No. 17-20495-Civ, 2017 WL 5634629, at *7 (S.D. Fla. Nov. 22, 2017) (Scola, J.) ("Under Florida law, the elements of a claim for money had and received and unjust enrichment are the same.").

Florida law requires that the plaintiff "directly confer" a benefit in order to state a claim for unjust enrichment and money had and received. *See Kopel v. Kopel*, 229 So.3d 812, 818 (Fla. 2017) ("[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant."). Here, the City does not allege that it directly conferred a benefit on the Manufacturer Defendants; rather, the City alleges that it contracted with insurance companies and the PBM Defendants, which then had separate relationships with the Manufacturer Defendants. (ECF No. 44 at ¶¶ 193, 276–77, 357.) Therefore, the City does not state a claim for Counts Three and Four against the Manufacturer Defendants. *See Belin v. Health Ins. Innovations, Inc.*, No. 19-61430-Civ, 2019 WL 9575236, at *12 (S.D. Fla. Oct. 22, 2019) (Seltzer, Mag. J.) (dismissing a claim for unjust enrichment as the plaintiff only directly conferred a benefit on a corporate subsidiary and not the corporate parent).

However, the City states a claim for unjust enrichment and money had and received as to the PBM Defendants. As discussed above, the City alleges that it paid money to and received services from some of the PBM Defendants. (*See* ECF No. 44 at ¶¶ 277, 357.) While the City does not identify specifically the nature of these payments and services, a claim for unjust enrichment and money had and received is "an equitable action and is less restricted and fettered by technical rules and formalities than any other form of action." *See United States v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386, 402–03 (1934). At the motion-to-dismiss stage, the City has adequately pled that the PBM Defendants received a benefit from the City and that it would be inequitable for the PBM Defendants to retain that benefit.

The Defendants argue that these claims, even if sufficiently pled, cannot be asserted against the PBM Defendants because contractual remedies control. *See Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So.2d 696, 697 (Fla. Dist. Ct. App. 2008) (holding that a claim for unjust enrichment "was precluded by the existence of an express contract between the parties concerning the same subject matter"). The Defendants point to alleged contracts that "guarantee[] [the City] all or some portion of the 'rebates'" received by the PBM Defendants. (ECF No. 60 at 31 (citing ECF No. 44 at ¶ 260).) However, the City alleges that the benefits conferred on the PBM Defendants are more than just the rebates; rather, the benefits include all payments retained by the PBM Defendants. (ECF No. 44 at ¶¶ 261, 379–380.)

In all, the Court **grants in part and denies in part** the Defendants' motion to dismiss the unjust enrichment and money had and received claims. The Court dismisses the claims for unjust enrichment and money had and received only as to the Manufacturer Defendants. These claims against the PBM Defendants were sufficiently pled and may proceed.

### D. Civil Conspiracy

In Count Five, the City alleges civil conspiracy against all Defendants, contending that each conspired to violate the Florida Antitrust Act and to commit the torts of fraud, unjust enrichment, and money had and received. (ECF No. 44 at ¶ 393.) To state a claim for civil conspiracy, a plaintiff must allege "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (Middlebrooks, J.).

The Defendants argue that the civil conspiracy claim must be dismissed as the City failed to plead an agreement to commit an underlying independent tort. (ECF No. 60 at 31.) As the Court held that the City sufficiently alleged a claim under the Florida Antitrust Act, the Court also holds that the City adequately pled a civil conspiracy to violate the Florida Antitrust Act. Therefore, the Court **denies** the Defendants' motion to dismiss the civil conspiracy claim.

### E. Statute of Limitations

The Defendants argue that each of the City's claims are time-barred by the applicable statutes of limitations. (ECF No. 60 at 32–36.) The City argues that various tolling doctrines apply so as to render its claims timely. (ECF No. 70 at 36–37.) At the outset, the Court notes that, in general, courts are hesitant to

bar a claim under the applicable statute of limitations at the motion-to-dismiss stage. *See Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1328 (S.D. Fla. 2012) (Cohn, J.) ("Generally, whether a claim is barred by the statute of limitations should be raised as an affirmative defense in the answer rather than in a motion to dismiss.") (citing *Cabral v. City of Miami Beach*, 76 So.3d 324, 326 (Fla. Dist. Ct. App. 2011)). Therefore, courts will only dismiss a claim if "facts on the face of the pleadings show that the statute of limitations bars the action." *See id.* The Court will discuss the statute of limitations and any applicable tolling doctrine for each remaining claim.

### 1. *Florida Antitrust Act*

Claims brought under the Florida Antitrust Act must be brought within four years of accrual. *See* Fla. Stat. § 542.26(1). The Defendants argue that the City's claims under the Act are time-barred to the extent that the City seeks to recover for payments made prior to June 16, 2017, or four years before the start of this suit. (ECF No. 60 at 33.) However, courts recognize the "continuing violations" doctrine under the Florida Antitrust Act and hold that such claims are not time-barred if brought within four years "after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'" *See Maralago Cay Homeowners Assoc., Inc. v. MHC Op. Ltd. P'ship*, No. 21-80049-CV, 2021 WL 6135181, at *4 (S.D. Fla. Aug. 5, 2021) (Middlebrooks, J.) (quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827–28 (11th Cir. 1999)). Courts have held that "ongoing sales or the collection of payments over time" constitutes a continuing antitrust violation. *See id.* (quoting *Bray v. Bank of Am. Corp.*, 784 F. App'x 738, 741 (11th Cir. 2019)). The City has alleged continuing payments for the medications at issue, and therefore the City has adequately alleged a continuing violation. (*See* ECF No. 44 at ¶ 304.) Therefore, the City's claim under the Florida Antitrust Act is not time-barred.

### 2. *Money Had and Received, Unjust Enrichment, and Civil Conspiracy*

The City's claims for money had and received, unjust enrichment, and civil conspiracy are subject to a four-year statute of limitations. *See* Fla. Stat. § 95.11(3)(p). The Defendants argue that the general rule for accrual of claims applies here—that a common-law claim accrues when the plaintiff is first injured. (ECF No. 60 at 33.) However, the City argues that the discovery rule applies to these claims as well. (ECF No. 70 at 36–37.) The discovery rule provides that claims accrue when "the facts giving rise to the cause of action

were discovered or should have been discovered with the exercise of due diligence." *See* Fla. Stat. § 95.031(2)(a); *see also Butler Univ. v. Bahssin*, 892 So.2d 1087, 1091 & n.3 (Fla. Dist. Ct. App. 2004) (referring to this as the "discovery rule" or the "delayed discovery doctrine").

As relevant here, the discovery rule applies to all claims "founded upon fraud," which Florida courts have interpreted to include all claims grounded in fraudulent activity. *See* Fla. Stat. § 95.031(2)(a); *Tejera v. Lincoln Lending Servs., LLC*, 271 So.3d 97, 102–03 (Fla. Dist. Ct. App. 2019) (holding that a civil conspiracy claim involving allegations of fraudulent activity was a claim "founded upon fraud"). Here, the City's remaining claims are all based on the City's underlying allegations of fraudulent antitrust behavior. (*See* ECF No. 44 at ¶¶ 383, 388, 393.) Therefore, the Court will apply the delayed discovery rule to the City's remaining claims.

The Defendants argue that the City should have discovered the facts giving rise to its claims on February 2, 2017, when a lawsuit alleging similar claims was filed against some of the Defendants in New Jersey. (ECF No. 60 at 32.) However, the Defendants do not cite any cases to support the proposition that a plaintiff should have discovered the facts giving rise to their claim merely because a similar lawsuit was filed in another jurisdiction. The Defendants do not argue that this New Jersey-based litigation was widely publicized; therefore, the Court is left to assume that the Defendants argue that reasonable diligence means plaintiffs must trawl court filings across the country for suits involving different plaintiffs with claims that may involve similar facts. Without any authority in support, the Court will not apply such a stringent understanding of reasonable diligence. Rather, the City has adequately pled that it could not have earlier discovered facts giving rise to its fraudulent-antitrust-based claims because of the opacity of the Defendants' pricing methods and the Defendants' refusal to disclose net prices. (*See* ECF No. 44 at ¶ 320.) The Court holds that the City has adequately alleged that its remaining claims are not barred by the statute of limitations.

### 4. Conclusion

For the reasons set out above, the Court **grants in part and denies in part** the Defendants' motion to dismiss. (**ECF No. 60.**) In particular, the Court **grants** the motion as to the common law fraud claim as well as the claims of money had and received and unjust enrichment as to the Manufacturer Defendants. The Court grants the motion on these claims **without leave to amend**. A request for leave to amend must be made by motion, which the City has not done. *See Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018) (holding that a request for leave to amend "has not been raised

properly" unless made by motion). The Court **denies** the motion in all other respect.

**Done and ordered** in Miami, Florida, on January 21, 2022.

Robert N. Scola, Jr.
United States District Judge