**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 1:21-cv-22636-SCOLA/GOODMAN

CITY OF MIAMI, FLORIDA,

    Plaintiff,

v.

ELI LILLY AND COMPANY, ET AL.,

    Defendants.

_____ /

**MANUFACTURER DEFENDANTS' MOTION FOR RECONSIDERATION
OF ORDER ON MOTION TO DISMISS**

Defendants Novo Nordisk Inc., Sanofi-Aventis U.S. LLC, and Eli Lilly and Company (the "Manufacturer Defendants"), by and through their undersigned counsel, hereby move for reconsideration of the Court's order, dated January 21, 2022, insofar as the order denied Defendants' motion to dismiss as to the City of Miami's (the "City") Florida Antitrust Act and civil conspiracy claims brought against the Manufacturer Defendants (the "Order"). ECF No. 87.

## PRELIMINARY STATEMENT

In its Order granting the motion to dismiss in part, the Court found that the City had alleged sufficient circumstantial evidence to plead an antitrust conspiracy, on the ground that the City's allegations showed that there was "no economic justification or self-interested rationale" for the parallel price increases taken by the Manufacturer Defendants. Order at 8. That ruling was predicated on the Court's conclusion that the complaint showed that it was "plausibly against the Manufacturer Defendants' self-interest" to follow other manufacturers' price increases when doing so would give rise to "a concomitant risk of losing market share in subsequent negotiations." *Id.* at 10.

That conclusion, however, relies on a misapprehension of the complaint, which does not allege that following price increases would cause the Manufacturer Defendants to risk losing market share. In fact, the complaint alleges the opposite—*i.e.*, if a Manufacturer Defendant did *not* follow price increases by its competitors, it would risk losing preferred placement on the formularies controlled by CVS Caremark, Express Scripts, OptumRx, and Aetna Rx (the "PBM Defendants"), which "could mean billions of dollars in profit loss" for the Manufacturer Defendant. Am. Compl. ¶ 225. The complaint itself thus shows not only that it was in each Manufacturer Defendant's self-interest to follow price increases, but that it could have been economically disastrous for any Manufacturer Defendant *not* to do so. The complaint thus supplies

an explanation for the Manufacturer Defendants' behavior that is consistent with each of those entities acting in furtherance of its own self-interest.

Because the Court's ruling sustaining the City's antitrust claim was predicated on an erroneous reading of the complaint's allegations, the Court should reconsider that ruling and hold that the City has done nothing more than allege parallel price increases. As the Court's Order correctly recognizes, and in accordance with a substantial body of law, merely alleging parallel price increases is insufficient to establish an antitrust conspiracy. Order at 9. The Manufacturer Defendants thus respectfully request that the Court hold that the City has failed to adequately allege its antitrust claim against them. And because a civil conspiracy claim requires an underlying independent tort (as is recognized in the Order), the failure of the antitrust claim—which is the only substantive claim against the Manufacturer Defendants to survive the Order—also requires dismissal of the City's civil conspiracy claim against the Manufacturer Defendants. *Id.* at 15.

## PROCEDURAL BACKGROUND

On September 27, 2021, Manufacturer Defendants (along with the PBM Defendants) moved to dismiss the amended complaint. ECF No. 60. On January 21, 2022, the Court granted that motion in part. As to the Manufacturer Defendants, the Court dismissed three of the five claims without leave to amend—*i.e.*, the claims for fraud, unjust enrichment, and money had and received. Order at 12-15. The Court denied the motion as to the two remaining claims, under the Florida Antitrust Act and for civil conspiracy. *Id.* at 5-12, 15.

As to the Florida Antitrust Act, as pertinent to this motion, the Court held that the City had adequately pleaded a claim for price fixing. *Id.* at 9-11. The Court explained that a plaintiff who attempts to plead an anticompetitive agreement on the basis of only circumstantial evidence "may not rely solely on allegations of parallel conduct or conscious parallelism in prices," and instead

must allege "plus factors" that "support an inference of agreement." *Id.* at 9. The Court concluded that the City had done so, insofar as the complaint "plausibly alleged that the Defendants have engaged in practices ***contrary to rational, competitive self-interest*** and that price uniformity has converged rather than diverged." *Id.* at 10 (emphasis added). The Court noted that the complaint alleges that the Manufacturer Defendants "have raised prices without a corresponding increase in the net price," which the Court found "suggests that the majority of the price increases have gone into rebates and other payments to the PBM Defendants while net prices remain stable." *Id.* From that conclusion, the Court further inferred that this "suggests that the Manufacturer Defendants have only seen a modest rise in profit following the price increase, a rise that could be threatened by losing market share in rebate negotiations." *Id.* Referring to an antitrust treatise, the Court held that "[f]ollowing a price increase when there is a concomitant risk of losing market share in subsequent negotiations is plausibly against the Manufacturer Defendants' self-interest, unless the risk of loss of market share is tempered by an anticompetitive agreement." *Id.* (citing Areeda and Hovenkamp, Antitrust Law ¶ 1432(b) n.20). The Court concluded that the City had therefore "plausibly alleged that the Manufacturer Defendants did not act self-interested in pursuit of profit-maximization, but rather that they agreed to raise prices and maintain market share." *Id.* at 11.[1]

As to the civil conspiracy claim, the Court denied the motion to dismiss insofar as it had denied the motion as to the Florida Antitrust Act claim. *Id.* at 15 ("As the Court held that the City sufficiently alleged a claim under the Florida Antitrust Act, the Court also holds that the City adequately pled a civil conspiracy to violate the Florida Antitrust Act.").

---

[1] Separately, the Court declined to apply the indirect purchaser rule at the pleading stage, found that the complaint adequately alleges a relevant market, and concluded that the complaint's "allegations concerning the Defendants' rebate negotiations . . . do not render the City's price-fixing conspiracy claim less suggestive." *Id.* at 5-9. The Manufacturer Defendants are not seeking reconsideration of any of those rulings.

## LEGAL STANDARDS

"Federal courts have substantial discretion in ruling on motions for reconsideration," and one ground that can "justify reconsideration" is "the need to correct clear error or prevent manifest injustice." *Just Play, LLC v. FitzMark, Inc.*, 2021 WL 4973587, at *1 (S.D. Fla. Sept. 9, 2021). Moreover, reconsideration is appropriate where a court has "misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Kapila v. Grant Thornton, LLP*, 2017 WL 3638199, at *1 (S.D. Fla. Aug. 23, 2017) (Scola, J.) (quoting *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992)).

## ARGUMENT

The Court's holding that the City had plausibly alleged that the Manufacturer Defendants had acted "contrary to rational, competitive self-interest" (Order at 10) is predicated on the Court's conclusion that "[f]ollowing a price increase when there is a concomitant risk of losing market share in subsequent negotiations is plausibly against the Manufacturer Defendants' self-interest, unless the risk of loss of market share is tempered by an anticompetitive agreement." *Id.* (citing Areeda and Hovenkamp, Antitrust Law ¶ 1432(b) n.20). But nowhere in the complaint does the City allege that the Manufacturer Defendants would risk a "loss of market share in subsequent negotiations" if they followed a price increase. To the contrary: As demonstrated below, the allegations in the complaint contend precisely the opposite—namely, that manufacturers would run the risk of losing market share if they *failed* to follow price increases. The complaint also makes clear that loss of market share could cause a significant drop in a manufacturer's profits. Am. Compl. ¶ 225 ("Controlling the baseline national formularies gives PBM Defendants a crucial point of leverage over the system. Because PBM Defendants have such a dominant market share,

4

*if they chose to exclude a particular diabetes medication from these formularies, or give it non-preferred position, it could mean billions of dollars in profit loss for Manufacturer Defendants*.") (emphasis added).

Thus, the complaint does not plausibly allege that the Manufacturer Defendants acted against their own self-interest. Rather, the complaint affirmatively explains how they have acted rationally and *in furtherance of* their self-interest. This means that the City has not sufficiently alleged the requisite "plus factors" to support a price-fixing conspiracy. Order at 9. Moreover, the issue of whether following a price increase would lead to a "risk of losing market share" was not briefed by the parties—*see generally* ECF Nos. 60, 70, 79—and thus the Court's ruling was made "outside the adversarial issues presented to [it]," making this issue especially appropriate for reconsideration. *Kapila*, 2017 WL 3638199, at *1.

The City's own allegations establish that the Manufacturer Defendants would risk losing market share in subsequent negotiations with the PBM Defendants if they did *not* increase prices. The City alleges that "Manufacturer Defendants need PBM Defendants to grant their insulins preferred formulary placement." Am. Compl. ¶ 341. According to the City, "PBMs . . . grant formulary status based upon" the highest list prices and the highest rebates. *Id.* ¶ 17. The City also specifically alleges that the reason the Manufacturer Defendants raised their list prices was to pay "larger and larger" rebates to the PBM Defendants and that the Manufacturer Defendants needed to do this "*in order to buy formulary position, which leads to increased sales and profits*." *Id.* ¶¶ 248, 255 (emphasis added). Thus, the City alleges that the Manufacturer Defendants' ability to secure formulary placement directly impacts the manufacturers' profitability and market

5

share—and the City also alleges that raising list prices is what "allow[s]" the Manufacturer Defendants to provide the discounts necessary to obtain those formulary positions. *Id.* ¶ 255.[2]

As explained above, the City in fact goes further and explains what would happen if the manufacturers did not raise prices and pay the correspondingly higher rebates to the PBM Defendants. Because the PBM Defendants control the national formularies that determine which manufacturer's insulins are available for purchase by insured consumers, the complaint alleges that losing position on one of those formularies "could mean billions of dollars in profit loss" and reduced market share for a Manufacturer Defendant. *See id.* ¶¶ 224-25. In other words, the complaint itself alleges that the Manufacturer Defendants raised prices to secure market share and profitability, and with the knowledge that failing to do so would hurt both market share and profitability. This is the definition of rational economic self-interest.[3]

In reaching its conclusion about the implications of the Manufacturer Defendants' pricing decisions, the Court relied on four paragraphs from the complaint. Order at 10 (citing Am. Compl. ¶¶ 224-25, 227-28). But those paragraphs further demonstrate that the Manufacturer Defendants'

---

[2] The Order notes the complaint's allegations that the Manufacturer Defendants raised list prices without a corresponding increase in net prices. Order at 10. Insofar as the Order questions the economic rationality of raising prices when price increases do not necessarily flow immediately to the bottom line, the complaint directly addresses that issue: The price increases directly support manufacturer profitability because without them, the manufacturers would have lost the ability to offer discounts necessary to obtain formulary access, which would have meant that their products would be available to many fewer consumers.

[3] Indeed, as the treatise the Court relied upon explains, in a "highly concentrated market" the "structure of the industry" itself makes "conscious parallelism in pricing behavior plausible." Areeda and Hovenkamp, Antitrust Law ¶ 1432(b) (discussing *Williamson Oil Co. v. Philip Morris U.S.A.*, 346 F.3d 1287 (11th Cir. 2003)). As the treatise also notes, the Eleventh Circuit in *Williamson* rejected the contention that the "industry structure" of a concentrated market itself constitutes a "plus factor," explaining that the characteristics of the market were "simply indicia that the tobacco industry is an oligopoly, which is perfectly legal." *Id.* (citing *Williamson*, 346 F.3d at 1317-18). Accordingly, to survive a motion to dismiss, the City needed to plead *facts* indicating that the Manufacturer Defendants engaged in conduct that is "inconsistent with the manufacturers' independent economic interests." *Id.* The City did not do so.

pricing moves were consistent with rational, competitive self-interest, because any failure to follow competitor price increases would risk losing market share:

- Paragraph 224 alleges that the PBM Defendants "control the formularies that determine whether diabetics will use Eli Lilly's, Novo Nordisk's or Sanofi's products" and that "preferred placement on a formulary increases a drug's utilization and the manufacturer makes more money."

- Paragraph 225 alleges that the PBM Defendants' control of the "baseline national formularies" gives them "a crucial point of leverage," since "if they chose to exclude a particular diabetes medication from these formularies, or give it a non-preferred position, it could mean billions of dollars of profit loss for Manufacturer Defendants."

- Paragraph 227 alleges that "PBMs have the greatest leverage in negotiating with drug manufacturers for formulary placement" in the diabetes space, because those drugs allegedly have "similar efficacy and risk profiles." This paragraph also cursorily alleges that "in a competitive market, manufacturers would compete on *lower* reported prices for formulary placement."

- Paragraph 228 reiterates the description of the underlying "scheme," alleging that the Manufacturer Defendants have agreed to "raise their publicly reported prices, but largely maintain the net price by paying a significant portion of this price back to PBM Defendants."

In sum, these paragraphs reiterate what the complaint as a whole alleges: namely, that if the Manufacturer Defendants did *not* follow price increases, the PBMs could choose to exclude their products from the PBMs' formularies, which would result in a risk of "billions of dollars of profit loss" for the Manufacturer Defendants. Thus, these paragraphs, like the complaint as a whole,

7

demonstrate that it was entirely in the Manufacturer Defendants' economic self-interest to follow price increases.[4]

To the extent any of these paragraphs, or other stray allegations in the complaint, could be interpreted to suggest that the Manufacturer Defendants would risk losing market share if they decided to match competitor price increases, such an interpretation would be more than outweighed by the extensive allegations in the complaint that demonstrate the opposite. But it is the City's burden to present allegations that go beyond "the realm of equipoise," *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1262 (11th Cir. 2019), and render it "*more plausible*" that the defendants would enter into an illegal agreement than simply act out of self-interest when acting out of self-interest would reach the same result, *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010) (emphasis added). Where, as here, there is an "obvious alternative explanation" showing that a defendant's actions were the result of self-interested behavior, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007), and the allegations of improper conduct "are at least just as plausibly explained by competition as they are by conspiracy," the antitrust claim should be dismissed. *Duty Free Ams. Inc. v. Estée Lauder Cos.*, 946 F. Supp. 2d 1321, 1334 (S.D. Fla. 2013) (Scola, J.) (citation omitted).

Finally, to the extent the Court's ruling was predicated on a finding that the complaint alleged "price uniformity where market conditions would otherwise 'ordinarily result in divergent pricing'" (Order at 7, 10), those allegations provide no basis to expect *divergent* pricing by

---

[4] More generally, any assessment of what is in a company's "economic self-interest" must consider the company's incentives to maintain a commercial relationship with its counterparties over time. And indeed, companies may forgo short-term profits for long-term investment out of a desire to maintain such a relationship. As Areeda and Hovenkamp explain, "[o]ne must not characterize a firm's sacrifice of short-run interest in favor of long-run interest as contrary to its self-interest," because "[s]uch a sacrifice by itself tells us nothing about possible conspiracy." Areeda and Hovenkamp, Antitrust Law ¶ 1415e.

8

individual manufacturers; they merely suggest that list prices should have been lower. *See* Am. Compl. ¶ 227 ("[I]n a competitive market, manufacturers would compete on *lower* reported prices for formulary placement"); *id.* ¶ 300 ("Without the Insulin Pricing Scheme and its secret payment and pricing system, Defendants would have been forced to compete for market share in the way competitors do in a healthy market: by offering lower actual prices that are available and transparent to the participants in the market."). But as explained above, the complaint's allegations fully explain why insulin list prices rationally would rise, given the market structure. And in any event, the allegations claiming that prices should have been lower are cursory and plainly inadequate to sustain an antitrust claim and subject defendants to the immense burdens of antitrust discovery. *See, e.g.*, *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355, at *11 (E.D.N.Y. Aug. 10, 2017) (holding that the "conclusory assertion that absent a horizontal conspiracy Abbott or its competitors would lower their prices in order to obtain more market share" did not "plausibly suggest the existence of an illegal agreement").

## CONCLUSION

For the reasons set forth above, the Manufacturer Defendants respectfully request that the Court reconsider its January 21, 2022 Order and grant the motion to dismiss as to the Manufacturer Defendants with regard to: (1) the Florida Antitrust Act, for failure to state a claim; and (2) the civil conspiracy claim, insofar as the Court dismisses the Florida Antitrust Act claim on which that claim is predicated.

Dated:  February 4, 2022                                Respectfully submitted,

*/s/ Laurie Uustal Mathews*
Derek E. León
Florida Bar No. 625507
Laurie Uustal Mathews
Florida Bar No. 120618
William Alexander O'Leary
Florida Bar No. 1018927
**LEÓN COSGROVE, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone:  305-740-1975
Facsimile: 305-351-4059
dleon@leoncosgrove.com
lmathews@leoncosgrove.com
woleary@leoncosgrove.com

and

Neal Potischman (pro hac vice)
Andrew Yaphe (pro hac vice)
**DAVIS POLK & WARDWELL LLP**
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2021
Facsimile: (650) 752-2111
neal.potischman@davispolk.com
andrew.yaphe@davispolk.com

James P. Rouhandeh (pro hac vice)
David B. Toscano (pro hac vice)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4835
Facsimile: (212) 701-5800
rouhandeh@davispolk.com
david.toscano@davispolk.com

***Attorneys for Defendant Novo Nordisk Inc.***

Michelle Della Guardia
JONES DAY
Brickell World Plaza
600 Brickell Avenue, Suite 3300

Miami, FL 33131 Tel: (305) 714-9700
mdellaguardia@jonesday.com

William D. Coglianese (pro hac vice)
**JONES DAY**
51 Louisiana Avenue N.W.
Washington, DC 20001
Tel: (202) 879-3939
wcoglianese@jonesday.com

*Attorneys for Defendant Sanofi-Aventis U.S. LLC*

Alan D. Lash
FL Bar No. 510904
**LASH & GOLDBERG LLP**
Miami Tower, Suite 1200
100 Southeast Second Street
Miami, Florida 33131
Tel: 305-347-4040
alash@lashgoldberg.com

and

James F. Hurst, P.C. (pro hac vice)
Andrew A. Kassof, P.C. (pro hac vice)
Diana M. Watral, P.C. (pro hac vice)
Ryan J. Moorman (pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
United States
Tel: 312-862-2000
jhurst@kirkland.com
akassof@kirkland.com
dwatral@kirkland.com
rmoorman@kirkland.com

and

Shankar Duraiswamy (pro hac vice)
Henry Liu (pro hac vice)
COVINGTON & BURLING LLP

11

One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-6000
sduraiswamy@cov.com
hliu@cov.com

Ziwei Song (pro hac vice)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Tel.: (415) 591-6000
ksong@cov.com

***Attorneys for Defendant Eli Lilly and Company***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of February, 2022, I electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which sent a notice of electronic filing to all counsel of record.

By: */s/ Laurie Uustal Mathews*
Laurie Uustal Mathews